1 ANDRÉ BIROTTE JR.
United States Attorney
2 ROBERT E. DUGDALE
Assistant United States Attorney
3 Chief, Criminal Division
JOEY L. BLANCH (Cal. Bar No. 186487)
4 Assistant United States Attorneys
Violent and Organized Crime Section
5     1500 United States Courthouse
312 North Spring Street
6     Los Angeles, California 90012
Telephones: (213) 894-3315/2450
7     Facsimile:  (213) 894-3713
E-mails:   joey.blanch@usdoj.gov
8
Attorneys for Plaintiff
9 UNITED STATES OF AMERICA

10              UNITED STATES DISTRICT COURT

11         FOR THE CENTRAL DISTRICT OF CALIFORNIA

12 UNITED STATES OF AMERICA,        No. CR 07-1221(A)-GHK

13           Plaintiff,             JOINT STATUS REPORT REGARDING
                                    TRIAL DATE; DECLARATIONS OF
14              v.                  STANLEY DAN RECZKO III, JOEY L.
                                    BLANCH, AND SA OLGA SAGALOVICH;
15 STANLEY DAN RECZKO III,
                                    GOVERNMENT'S PROPOSED ORDER
16           Defendant.            REGARDING EXCLUDABLE TIME FILED
                                    CONCURRENTLY
17

18          On or about May 20, 2014, the Court ordered the Government and

19 defendant Stanley Dan Reczko, III ("defendant"), to meet and confer

20 to discuss dates for the Motion to Suppress Hearing and Trial, and

21 to come to an agreement regarding proposed findings of excludable

22 time, and to submit a joint status report within 7 days thereafter.

23 (Docket 794).  If the parties could not come to an agreement, the

24 Government was ordered to independently propose excludable time

25 findings.  (Id.)

26          The parties have been unable to reach an agreement regarding

27 the trial date, and defendant instead filed a "Motion For Immediate

28

Evidentiary Hearing and Trial or Dismissal of Indictment."   On June
10, 2014, the Court rejected defendant's filing, and referred
defendant to the Court order that the parties attempt to reach an
agreement and file a joint status report.

The parties hereby file their respective positions regarding
the trial date.  Defendant's position is attached hereto as the
declaration of Stanley Dan Reczko, III.  The government's position
is set forth below, and is based on the attached status report,
declarations of Joey L. Blanch, SA Olga Sagalovich, and the file and
records of this case.

Dated: June 16, 2014              Respectfully submitted,

                                  ANDRÉ BIROTTE JR.
                                  United States Attorney

                                  ROBERT E. DUGDALE
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                  _____/s/_____
                                  JOEY L. BLANCH
                                  Assistant United States Attorney
                                  Deputy Chief, Violent & Organized
                                  Crime Section

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

## GOVERNMENT'S STATUS REPORT

In communications with the government and in his rejected motion for trial or dismissal of the indictment, defendant has requested an "immediate" trial, and has suggested a trial date in early September.  The government agrees that, as soon as possible, the Court should set a date for trial.  Further, the government agrees that the trial date should be set at the earliest date possible.  However, as defendant is aware, witnesses needed by both the government and defendant for both the evidentiary hearing on defendant's motion to suppress and for trial must be authorized by the Philippine government.  Although this authorization has already been sought, the previous authorizations were tied to the October 1, 2013 trial date; the government has been informed that re-authorization could take 4-6 months, and cannot be sought until a new trial date has been set.  In the meantime, the government is in the process of re-contacting the witnesses regarding their availability so that the government can make the request of the Philippine government as soon as possible after the trial date is set.

Based on the time necessary to obtain the presence of foreign witnesses, as well as the availability of defense standby counsel David Kaloyanides, the government suggests a trial date in early December, 2014 or February, 2015.

Set forth below is the government's status report regarding the government's attempts to meet and confer with defendant, information supporting the government's requested trial dates, and facts supporting the government's separately-filed proposed order regarding excludable time.

## I.   MAY/JUNE 2014 ATTEMPTS TO MEET AND CONFER REGARDING THE TRIAL DATE

On May 20, 2014, the Court ordered the Government and defendant Stanley Dan Reczko, III ("defendant"), to meet and confer to discuss dates for the Motion to Suppress Hearing and Trial.  (Docket 794). If the parties could not come to an agreement, the Government was ordered to independently propose excludable time findings.  (Id.)

On May 29, 2014, the parties met in person at Metropolitan Detention Center ("MDC") to discuss dates for trial, and also to go over a list of items defendant had emailed to the government.  AUSA Joey Blanch, Special Agent Olga Sagalovich, defendant and defense paralegal Kathleen Caulfield were present.  (Declaration of Joey L. Blanch ("Blanch Decl.") ¶9, Exh. A; Declaration of SA Olga Sagalovich ("Sagalovich Decl.")  ¶2).

At the beginning of the meeting, defendant told the government that he did not wish to set a trial date until after he had completed his computer forensic exam, and asked if the government would agree to make this request of the Court.  (Sagalovich Decl. ¶3).  The government suggested that they at least discuss possible trial dates, both because they had been ordered to do so by the Court and so they could begin making arrangements for witnesses to be present.  (Id.).  In response, defendant stated that he wanted a trial as soon as his forensic exam was over. (Sagalovich Decl. ¶13).

The government suggested that they go through defendant's list before discussing a particular trial date, as the list contained questions regarding witness travel that could impact defendant's opinion regarding the trial date.  As set forth in more detail in

2

1  the attached declarations of Joey Blanch and SA Sagalovich, topics

2  discussed during that meet and confer included:

3      1.  The government would assist defendant in obtaining U.S.

4  government permission for defense witnesses to enter the United

5  States, such as a visa or a special benefit parole.  However, in

6  order to process the applications, 6-8 weeks prior to travel,

7  defendant would have to provide the government with specific

8  information regarding each witness.  The government noted that this

9  information included the witnesses' passport number, and that it was

10  possible defendant's witnesses did not have a passport.  Therefore,

11  defendant would need to build in time for his witnesses to obtain a

12  passport prior to applying for permission to travel to the U.S.

13  (Sagalovich Decl. ¶5-6).

14      2.  Other than assisting defendant with visas/special benefit

15  parole, the government was not responsible for defendant's

16  witnesses.  The government could not advise defendant regarding how

17  he should arrange travel, hotel, witness interviews, etc, but

18  suggested that perhaps standby counsel could advise him.

19  (Sagalovich Decl. ¶ 5-6).  Defendant indicated that he understood,

20  but then said something to the effect that perhaps the government

21  was only responsible for his witnesses when they are in the United

22  States.  The government stated that it was not responsible for the

23  presence defense witnesses, regardless of whether they were in the

24  United States.  (Sagalovich Decl. ¶14).  The government informed

25  defendant that it could not give him legal advice, but suggested

26  that perhaps he was confusing his right to call witnesses in his own

27  defense and to request subpoenas from the Court with the concept

28  that the government - meaning the U.S. Attorney's Office - was

responsible for ensuring the presence of defendant's witnesses at trial.  The government assured defendant that he had the right to call witnesses in his own defense, but stated again that the government was not responsible for ensuring the presence of these witnesses.  (Sagalovich Decl. ¶14).

3.   The government reminded defendant that for government witnesses, where the subject of their testimony was related to their work as a Philippine government employee, the Philippine government had to authorize them to travel and testify.  For government witnesses, the method of obtaining this authorization was an MLAT. The government did not know whether this requirement applied to any of defendant's witnesses, but warned that, if so, seeking such permission could be time consuming.  The government believed that the method of seeking such permission was letters rogatory, but could not give him legal advice. (Sagalovich Decl. ¶8).

4.   With respect to the MLAT, the government advised defendant that when the trial was set for October 2013, the Philippine government had authorized the travel for witnesses Jennifer Tadena, Anita Suico, and Jose Ramon Ugarte and Mabert Impas, Jr.  The Philippine government had not yet authorized the travel for Dionardo Carlos at the time the October 2013 trial date was vacated.  The government further informed defendant that the government had recently learned from Don Ashley, an attorney with the Department of Justice Office of International Affairs, stationed in the Philippines, that this authorization was trial-date specific. Therefore, when the Court set a new trial date, the government would need to request that the Philippine government re-authorize travel for these five MLAT witnesses.  Thus, time to obtain this re-

1  authorization should be built into the trial date.  (Sagalovich
2  Decl. ¶ 5, 9).

3      The need to build in time for the Philippine government to re-
4  authorize these witnesses to travel and testify is critical not just
5  because they are government witnesses, but because they are also
6  witnesses requested by the defense.  At a number of hearings,
7  defendant has sought government assurance that the government was
8  planning to call the MLAT witnesses for the evidentiary hearing
9  and/or trial.  Specifically, witnesses Ugarte, Impas, and Carlos
10 were involved in defendant's arrest in 2007, during which items of
11 evidence were seized that are subject to defendant's motion to
12 suppress.  Defendant has indicated that wishes to question these
13 witnesses at the evidentiary hearing on his motion to suppress.
14 Further, on September 9, 2013, when defendant waived all foreign
15 depositions, he specifically stated that he did not need the
16 depositions because the deposition testimony would be "cumulative."
17 (Dkt. 626).  Certain of the depositions sought by defendant were
18 specifically cumulative of Ugarte, Impas, and Carlos, who would be
19 present at the hearing.

20     After discussing defendant's list of concerns, defendant and
21 the government discussed possible trial dates.  Defendant reiterated
22 his demand to go to trial as soon as his forensic exam was complete.
23 The government inquired what defendant meant by "immediate," given
24 that it would take weeks just to obtain authorization for defense
25 witnesses' special benefit parole.  After conferring with a
26 calendar, defendant suggested a trial in October.  (Sagalovich Decl.
27 ¶13).

28

1   At this point, the government wondered if defendant and Ms.
2   Caulfield wished to discuss the trial date in private, given the
3   logistical challenges of arranging for defense witness travel.
4   Defendant and Ms Caulfield agreed, and AUSA Blanch and SA Sagalovich
5   stepped out of the room. (Sagalovich Decl. ¶14).  Shortly
6   thereafter, Ms Caulfield invited the government back into the room.
7   As the government was taking their seats, defendant blurted out
8   something to the effect that if his witnesses weren't there for
9   trial, it would be the government's problem. (Sagalovich Decl.
10  ¶14).  The government was then informed that defendant still wished
11  to go to trial in October.  After checking with a calendar, the
12  parties tentatively agreed to September 22, 2014 for the evidentiary
13  hearing and October 7, 2014 for the trial date, although the
14  government was going to attempt to confirm witness availability for
15  those dates. (Sagalovich Decl. ¶13-14).

16  That same afternoon, the government received an email from Ms
17  Caulfield, indicating that defendant had changed his mind, and now
18  wished to set a trial date a month earlier, in September.  (Blanch
19  Decl. ¶10).

20  The government responded that it needed to check witness
21  availability, and would check for both September and October.
22  Almost immediately, however, the government realized that a trial
23  date in September likely did not give the Philippine government
24  sufficient time to reauthorize witness travel for the five witnesses
25  subject to the MLAT.  In preparation for selecting a trial date,
26  AUSA Blanch had contacted Don Ashley, an attorney with Department of
27  Justice, Office of International Affairs, to confirm that all the
28  MLAT witnesses had been authorized by the Philippine government.

6

1  (Blanch Decl. ¶11).   AUSA Blanch had learned that the MLAT

2  authorization had been tied to the October 2013 trial date; although

3  no new MLAT is required, the Philippine Department of Justice would

4  need to reauthorize all five MLAT witnesses once a new trial date

5  was selected.   Mr. Ashley suggested that the trial date be set at

6  least six months in advance in order to allow the Philippine

7  government time to reauthorize the witnesses.   (Id.).

8       AUSA Blanch recontacted Ms Caulfield to inform her of Mr.

9  Ashley's suggesting that the trial date be set at least six months

10 out.   Due to the December holidays, which would likely interfere

11 with witness availability, the government suggested a trial date in

12 January.   Ms Caulfield stated that she would discuss the matter with

13 defendant.   (Blanch Decl. ¶ 12).   Defendant did not respond until

14 after close of business the next day (Friday, May 30, 2014),

15 informing the government that he intended to file a motion for an

16 "immediate" trial or to dismiss the indictment.   (Blanch Decl. ¶13).

17      The Court rejected defendant's motion and noted that defendant

18 had failed to follow the Court's instruction to file a joint status

19 report.   The government reached out to defendant again, suggesting

20 that that they make another attempt to agree on a trial date.   If

21 they could not agree, the government suggested that they at least

22 make an attempt to file a joint status report.   (Blanch Decl. ¶16).

23 Defendant responded that there would be no agreement, and that if

24 the government wished to file a joint status report, the government

25 should incorporate defendant's position from his rejected motion for

26 an immediate trial or to dismiss the indictment.   The government

27 informed defendant that the government could not draft his position

28 for him, but that if he would send his position, the government

7

1  would file it with the government's position in a joint filing.

2  Defendant subsequently sent his declaration to the government to be

3  attached as his position.   (Blanch Decl. ¶17).   Defendant's

4  declaration is attached hereto.

5  **II.   GROUNDS FOR SETTING A TRIAL DATE IN DECEMBER 2014 OR FEBRUARY**
**2015 OVER DEFENDANT'S OBJECTIONS**

6

7      Defendant has been in custody since 2007.   The delay in

   bringing the case to trial, however, has been caused by defendant's

8  own actions.   For example, he demanded foreign depositions,

9  contested almost every aspect of those depositions for approximately

10  a year, then decided he no longer needed them.   As soon as

11  preparations were called off, however, he changed his mind and

12  demanded the depositions again, attempting to begin the process all

13  over again.   When the trial date was set in October 2013 and the

14  government had obtained MLAT authorization for foreign witnesses to

15  be present, he fired his lawyers and began essentially litigating

16  the case all over again.   He demanded that discovery be reproduced

17  and re-litigated, filing frivolous motions such as demands that

18  agent cell phone numbers and email addresses be unredacted, and made

19  new discovery demands for documents which were generated well after

20  the allegations alleged in the indictment and which are therefore of

21  questionable relevance.   He demanded that the defense forensic exam

22  – an exam that had already been conducted when he was represented --

23  be conducted anew with a new computer forensic examiner.   He has

24  filed motion after motion – well after the motions cutoff dates set

25  by the Court.

26      In the face of all this delay, defendant has simultaneously

27  demanded an immediately trial.   However, as defendant's own actions

28

have entrenched him in ongoing pretrial litigation, the Court has been unable to set a trial date.  Until a trial date is set, the government cannot arrange for foreign witnesses to be present.

The government has attempted to discuss a reasonable trial date with defendant.  However, it is clear from his statements and actions that he believes he can obtain a tactical advantage by not setting a trial date until the last possible minute, and then demanding a trial date immediately, making it impossible for the government to arrange for the presence of foreign witnesses.  This is corroborated by defendant's inquiry into imposing sanctions on the government if key witnesses are not present, statements he made during the meet and confer indicating a belief that it was the government's responsibility to ensure the presence of defense witnesses and that it would be the government's problem if defense witnesses were not present for trial, his subsequent attempts to advance the date tentatively agreed on in the meet and confer, and his court filing demanding either an immediate trial or dismissal of the indictment.

Based on the time needed to obtain witnesses from the Philippines for both the evidentiary hearing and the trial – witnesses that defendant himself demanded be present for these proceedings -- as well as the schedule of stand-by counsel David Kaloyanides, defendant's ongoing forensic examination, outstanding discovery demands, and continued filing of pretrial motions, many of which are still pending, the government suggests a trial date in early December 2014 or February 2015.

**A.    TIME NECESSARY TO OBTAIN THE PRESENCE OF FOREIGN WITNESSES**

The government has re-contacted Mr. Ashley to inquire about the process of re-authorizing the five MLAT witnesses.  Mr. Ashley confirmed that no new MLAT is required.  However, he reiterated that the Philippine government authorization for the MLAT witnesses to travel and testify was tied to the trial date.  He noted that in preparation for the October 2013 trial date, the Philippine government took more than four months to authorize four of the five witnesses, and the fifth witness had not yet been authorized at the time the trial date was taken off calendar.  While it is possible that it will take less time to re-authorize the witnesses since they have already been approved once, 5-6 months may be required. (Blanch Dec. ¶11, Exh. C).

**B.    AVAILABILITY OF DEFENDANT'S STANDBY COUNSEL**

The government has communicated with defendant's standby counsel, David Kaloyanides, regarding his availability for trial. He stated that he would be unavailable for parts of October 2014 due to a short child pornography trial, that he was entirely unavailable in January, 2015 due to a complex drug case before the Honorable Judge Virginia A. Phillips, and that he had a complex mortgage fraud case before Judge Phillips in March, 2015.  He currently has a trial set for the entire month of November, 2014, although that could be continued.  He stated that he could be available for a trial in late October 2014, the first week of December 2014, or the week of February 17, 2015.  However, he said that if the trial did not commence by February, 2015, he would otherwise be unavailable until June 2015.  (Blanch Decl. ¶14).

C.   **PREVIOUS EXCLUDABLE TIME FINDING**

Defendant was charged via complaint on September 12, 2007.  He was subsequently indicted on November 2, 2007.  At post indictment arraignment, jury trial was set for December 11, 2007.

Since then, the trial date has been continued multiple times at the request of the parties.  On June 27, 2012, the Court set the hearing on defendant's Motion to Suppress for March 19, 2013, and the trial for April 2, 2013.  The Court found the period between December 11, 2007 and April 2, 2013, to be excluded in computing the time within which the trial must commence, pursuant to the Speedy Trial Act.

On September 25, 2012, the parties filed a Joint Brief in support and in Opposition to defendant's motion to suppress evidence seized by the International Justice Mission.  The Court has not yet ruled on this motion because, in part, an evidentiary hearing may be necessitate the attendance of various foreign witnesses, whose availability are not within the power of the Court to control.

On September 12, 2012, defendant filed his request to be allowed to take pretrial depositions in the Philippines, pursuant to Federal Rules of Criminal Procedure, Rule 15 ("Rule 15").  Defendant argued that these depositions were necessary for both his Motion to Suppress and for his defense at trial, and therefore must be taken prior to any hearing on the Motion to Suppress and prior to trial.

On January 18, 2013, the Court granted defendant's request to take foreign depositions of Dilausan Montor, Jillimar Tindor, Ana Roselis magalag, Neda Alfech, Lucy Planas and Christopher Derama. (Dkt. 509).  However, on February 15, 2013, the Court re-opened its decision as to the depositions of Dilausan Montor and Lucy Planas.

11

1   The Court ordered further briefing regarding the depositions of
2   these witnesses.   (Dkt. 521).

3        Further, the parties disagreed regarding the appropriate method
4   for seeking permission of the Philippine government to take these
5   depositions, and further briefing was ordered on February 28, 2013.
6   The issue of depositions was further complicated by defendant's
7   desire to be personally present in the Philippines for the Rule 15
8   depositions.   When the government indicated an intention to attempt
9   to obtain information from the Philippine government related to this
10  request, defendant objected. On February 28, 2013, the parties were
11  ordered to submit additional briefing regarding whether and how the
12  government could obtain information from the Philippine government
13  in order to allow it to address defendant's request to be present
14  for the depositions.

15       Due to the extensive litigation involving defendant's request
16  to take depositions in the Philippines, as well as the complicated
17  and slow nature of seeking and obtaining permission for defendant's
18  depositions in the Philippines, taking the depositions and keeping
19  the April 2, 2013 trial date were mutually exclusive.   Nevertheless,
20  defendant insisted on both.

21       On February 28, 2013, the Court issued a minute order,
22  continuing the hearing on the Motion to Suppress to September 17,
23  2013 and the trial date to October 1, 2013.   On March 8, 2013, the
24  Court issued a Speedy Trial order, finding that the time period of
25  April 2, 2013 to October 1, 2013 was excludable time pursuant to the
26  Speedy Trial Act.   (Dkt. 536).

27

28

**D.    POST MARCH 8, 2013 LITIGATION CREATING EXCLUDABLE TIME**

The Court is well aware of the history and docket in this case. However, for the purpose of setting forth grounds for the government's proposed finding of excludable time, the government details the litigation causing delay since the March 8, 2013 excludable time findings.

**1.    Defendant's request to proceed pro se**

On May 8, 2013, defendant filed a request for self-representation.  (Dkt. 561).  On May 15, 2013 the Court issued orders for a psychiatric exam of defendant to evaluate his competency to represent himself.  (Dkt. 566).  Defendant objected to the psychiatrist appointed by the Court, so the Court appointed a different psychiatrist on May 28, 2013.  (Dkt. 572, 574).

On August 1, 2013, defendant filed another application to be allowed to proceed pro se.  (Dkt. 602).  After filing positions with respect to the psychologists report, the parties appeared for a hearing on September 9, 2013.  (Dkt. 609, 611, 626).  At that time, defendant's request to represent himself was granted, although the Court appointed David Kaloyanides as defendant's standby counsel. Based on defendant's request to file new pretrial motions, the Court vacated the September 17, 2013 evidentiary hearing and the October 1, 2013 trial date.  (Dkt. 626).

Defendant's decision to represent himself caused some delay simply because of the logistics surrounding an in-custody defendant's ability to research, make filings, and communicate with his defense team.  There is a record of defendant's team getting up to speed in the form of filings regarding the appointment of paralegals, investigators, forensic examiners, motions to compel MDC

13

1  to give him extra time in the law library and allow him to

2  communicate with the defense team via email and telephone, etc.

3  This litigation continued until approximately December, 2013.  (See,

4  e.g., Dkt. 686, 687, 688, 690, 694, 695, 695, 696, 697, 698, 699,

5  704).

6            2.   Transition of File from Former Defense Counsel to
               Defendant; Reproduction of All Previously Produced
7               Discovery

8       The transition of the case file from defendant's former counsel

9  to defendant himself was not a smooth process.  Defense counsel was

10  ordered to produce the case file and all discovery to defendant, but

11  defendant claimed that this was not done.  Transfer of discovery was

12  further complicated by the fact that discovery had been previously

13  produced to defense counsel pursuant to a protective order, which

14  prohibited defense counsel from providing defendant with un-redacted

15  documents that identified the victim.  Production to defendant

16  required the redaction of this information.  After status

17  conferences and orders to former defense counsel yielded results

18  that did not satisfy defendant, the Court ordered the government and

19  IJM to re-produce the discovery to defendant.

20       The government produced this discovery, but included certain

21  minor redactions in addition to identifying information of the minor

22  victim.  The government produced a log regarding these reactions,

23  which included such things as the case agent's cellphone number,

24  email addresses, law enforcement fax numbers, and the location of a

25  victim safehouse in the Philippines.  Without any indication of why

26  this information was relevant or why he was entitled to it,

27  defendant objected, forcing the government to respond.  The Court

28  ultimately denied defendant's objections.  (Dkt. 714, 717, 724).

1    In addition to the re-production of already produced discovery
2    to defendant, it took months for the satisfactory transfer of the
3    non-discovery files from defense counsel to defendant.  For docket
4    entries related to the transition of the case from defense counsel
5    to defendant himself, as well as the reproduction of the previously
6    produced discovery, see, e.g., dkt. 627, 632, 633, 638, 645, 646,
7    647, 674, 679, 706, 711, 725, 731, 732.  According to these docket
8    entries, this transfer was not found to be complete until March 12,
9    2014, and defendant was still filing status reports as to the
10   production of the case file on March 25, 2014.  (Dkt. 749).

11        3.  Discovery

12        The Court's order to the government and IJM to reproduce
13   discovery to defendant did not end defendant's demands for
14   discovery, both from the government and IJM.  Litigation regarding
15   defendant's discovery demands including the following:

16        a.  Motion to Compel Discovery: on September 19,
17   2013, defendant filed a motion to compel discovery, demanding among
18   other things, extensive discovery of documents and records, physical
19   inspection of the original evidence, and a new defense forensic
20   examination of the digital evidence.  (Dkt 628).  He further filed a
21   request to alter the protective order, although later withdrew this
22   request.  The government responded on October 21, 2013.  (Dkt 657,
23   659).  Defendant did not file his reply until March 17, 2014.  (Dkt.
24   735).  The government filed a sur-reply on March 25, 2014.  (Dkt.
25   747).  Defendant followed suit on March 26, 2014.  (Dkt. 750).  He
26   filed a supplement to his sur-reply on April 18, 2014.  (Dkt. 763).
27   The documents regarding this litigation indicate that the government
28   has consistently made a good faith effort to provide defendant with

15

1  access to the requested discovery, without undue or unnecessary
2  delay, even where the government disagrees with defendant regarding
3  the relevance of the items at issue.

4          b.   IJM:  The discovery production from IJM to
5  defendant has been particularly time consuming, involving multiple
6  meet-and-confer sessions, status conferences, motions, and in camera
7  reviews.  For example, defendant is litigating the production of two
8  video-recorded interviews of defendant that IJM claims is protected
9  by a therapist-patient privileged.  The Court agreed to review the
10 videos in camera, but they were not in English.  The Court ordered
11 IJM to provide an English-language transcript, but defendant
12 objected, arguing that even a court-certified translator hired by
13 IJM would not be unbiased.  The Court ultimately agreed to hire its
14 own translator.  (See, e.g., Dkt. 670, 673, 683, 684, 703, 733, 735,
15 755, 760, 761, 762, 778, 784, 785, 786, 787, 788, 789, 792, 793,
16 803, 797, 799, 800, 801, 802, 805, 811, 812. 813, 814, 815, 816,
17 817, 818, 819, 830, 831).  The litigation between IJM and defendant –
18 including the litigation of the production of the video recordings
19 of the victim -- is ongoing as of June 15, 2014.  (Dkt. 830,
20 defendant's "judicial notice of psychotherapy privilege waiver by
21 victim," arguing additional grounds why IJM should produce the
22 videotaped therapy interviews to him; 831, renewed motion to compel
23 IJM to produce discovery, filed June 9, 2014 but appearing on docket
24 on June 16, 2014).

25         c.   Motion for Appointment of Forensic Media Expert.
26     Although a forensic exam was conducted on the digital devices
27 while defendant had counsel, once defendant began representing
28 himself, he requested that the forensics be redone.  On September

19, 2013, defendant requested the appointment of a computer forensic expert. (Dkt. 631). On October 24, 2013 defendant requested that the Court specifically appoint forensic examiner Jeffrey Fischbach. (Dkt. 666). This was granted on November 4, 2013. (Dkt. 671). Defendant filed an additional request related to forensics on November 22, 2013, granted by the Court on December 3, 2013. (Dkt. 692, 702).

Although the government repeatedly offered to make the digital devices available to defendant and his expert, defendant did not wish this exam to be conducted until he had conducted a thorough review of the evidence and litigated certain discovery disputes. Ultimately, the defense expert arranged to begin his forensic exam on June 9, 2014.

This exam involved defendant's demand that Mr. Fischbach be allowed to perform the exam on the original devices, rather than from forensic copies of the devices – something to which the government agreed. It also involved defendant's motion, filed March 23, 2014, to be personal present at the government forensic lab, which was opposed by the government, and ultimately denied by the Court. (Dkt. 804, 810, 820).

Mr. Fischbach conducted the exam from June 9-12, 2014, but as of the date of this filing, the forensic exam is not complete. After the first day of the exam, defendant claimed that the government had not provided the defense expert with all the digital devices. Based on an email conversation with Mr. Fischbach that day, it is the government's understanding that the "missing" digital evidence are not original digital devices on which forensic review would normally be performed; rather, it was simply 13 compact disks

provided by IJM to the government, containing photographs IJM
investigators had taken of evidence after it was seized.  These
photographs had already been produced to defendant; nevertheless,
the government agreed that the disks would be provided to Mr.
Fischbach to create forensic images.  It is the government's
understanding that Mr. Fischbach has made arrangements to return to
do more work in July, 2014.  In the meantime, the government has
offered to arrange for Mr. Fischbach and defendant to meet at the US
Attorney's Office to go over the exam thus far.  The government has
also offered to determine whether the US Attorney's Office could
facilitate additional review at HSI labs sooner than July, 2014,
although Mr. Fiscbach may not be available until then.

        d. Motion to Compel Production of Original Hard
Drive.  On February 4, 2014, defendant filed a motion to compel the
government to provide his expert with an original piece of evidence
- a hard drive.  (Dkt. 719).  The Court ordered the government to
respond on March 6, 2014.  The government responded that it had
already met with defendant and defense counsel in person to discuss
how to make the original hard drive available to the defense expert,
without letting it leave the government's possession.  (Dckt. 727).
On May 9, 2014, defendant ultimately agreed that the issue was moot,
and on May 14, 2014, the Court denied defendant's motion. (Dkt. 782,
789).

        d.    Original Evidence Review:  Defendant has
repeatedly made non-specific claims that the government is
withholding exculpatory evidence or has altered original evidence.
On three separate occasions, the government has brought defendant to
the US Attorney's Office to review the original evidence in this

1  case.   On two of these occasions, defendant spent almost the entire

2  day with the evidence, in the company of his paralegal, his

3  investigator, and his forensic expert.   (Blanch Decl. ¶18).

4          As set forth in more detail in the declaration of Joey Blanch,

5  the government rejected defendant's request that the government re-

6  produce to him all documents and records provided for his review, or

7  allow him to make these copies himself.   Rather, the government told

8  defendant that he could identify any document not already produced,

9  the government would determine if it objected to providing defendant

10  with a copy, Bates number it, make necessary redactions, and produce

11  it to defendant.   In response, while reviewing the documents with

12  the defense team outside the presence of the AUSA or the case agent,

13  defendant took hundreds of photographs of the unredacted documents

14  and records.   (Blanch Decl. ¶¶18-27).   The parties have attempted to

15  resolve this dispute without bothering the Court; the government

16  sets it forth here only to make a record regarding the fact that the

17  photographs are in the possession of the defense team and the

18  agreements made between the government and defendant about how these

19  photographs should be handled.

20          e.   Discovery from the State Department:   After

21  defendant's arrest in the Philippines but prior to his deportation,

22  he spent time in a Philippine jail.   During this time, he

23  communicated with the U.S. State Department.   In 2014, Defendant has

24  demanded production of all U.S. State Department records regarding

25  him.   Although the government questions the relevance of this

26  discovery, given that the records were generated well after the

27  events alleged in the Indictment, the government voluntarily agreed

28  to obtain the records and produce them to defendant.   However, in

April 2014, defendant nevertheless filed a request for a subpoena to the State Department, and objected to the government's proposal that the subpoena was unnecessary as it was in the process of obtaining State Department documents for defendant.  (Dkt. 756, 758, 759, 764, 766, 775, 777, 779, 791, 781, 783, 790, 796, 798.)

The government produced some responsive documents on May 14, 2014.  As of June 15, 2014, however, this production is not yet complete.  The State Department has collected a number of records for review, but the government must review them at State Department facilities in Washington, D.C.  The government has arranged for a Department of Justice attorney to facilitate this review, but that individual is still going through a clearance process by the State Department.

    f. <u>Consulate Log Book</u>:  Defendant demanded a log book from the U.S. consulate in Cebu, Philippines, from January 2006.  The State Department stated that the book cannot be removed from the consulate.  Further, according to State Department employees, defendant's name was not in the book for January 2006. Copies of the January 2006 book were provided to the government, who confirmed that defendant's name did not appear, but that the copies cut off some of the entries.  An agent was dispatched to travel to the US Consulate to make new copies.  Defendant's name still did not appear in January 2006.  However, the agent copied additional months out of an abundance of caution and found defendant's name in February 2006. (<u>see, e.g.</u>, Dkt. 775).  Copies of the logbook page with defendant's name on it, with the names of unrelated visitors to the Consulate redacted, were provided to defendant in May 2014.

1         g.   Discovery from Office of International Affairs:

2     On May 26, 2014, defendant requested discovery of all records

3 regarding him from the Department of Justice, Office of

4 International Affairs, in 2007.  The government has agreed to see if

5 there are any relevant, non-privileged, responsive documents.  Some

6 documents have been produced for government review from OIA in the

7 Philippines, but OIA in Washington D.C. is still reviewing their

8 records.  Thus, while this is not the subject of a filed discovery

9 dispute, it is a discovery request that is currently outstanding.

10       4.   Pretrial Depositions

11     As set forth above, in March 2013 – the last time the Court

12 made excludable time findings - one of the main reasons for

13 continuing the trial was the delay caused by defendant's request to

14 take pretrial depositions in the Philippines.  The litigation and

15 preparations for these depositions continued well after the March 8,

16 2013 order regarding excludable time:

17        • Dilausan Montor.  On March 20, 2013, the parties filed a
18          joint brief regarding the depositions as well as a joint
            brief regarding the deposition of Dilausan Montor. (Dkt.
19          544, 544).

20        • PDOJ Opinion.  On April 2, 2013, the Court granted the
21          government's request to seek legal opinions regarding the
            depositions from the Philippine Department of Justice
22          ("PDOJ").  (Dkt. 552).  The process of seeking this
            opinion, as well as the government's efforts to seek PDOJ
23          permission for the five MLAT witnesses to travel and
            testify were detailed in multiple status reports filed by
24          the government. (Dkt. 569, 579, 590, 601, 622).

25        • Lucy Planas.  On April 2, 2013, the Court directed the
26          parties to update the Court regarding facts relevant to
            the Court's determination of whether Lucy Planas should be
27          deposed (Dkt. 552).  On April 24, 2013, the government
            filed a status report regarding issues involved in seeking
28          the depositions in the Philippines, including the

availability of Lucy Planas for trial.  (Dkt. 558).  On May 7, 2013, the Court directed the parties to file a joint status report regarding Lucy Planas' ability to travel to the United States.  (Dkt. 561).  On May 28, 2013, the Court ordered that additional information regarding Lucy Planas be provided.  (Dkt. 572).  The government filed this additional information on June 10, 2013.  (Dkt. 580).  On June 20, 2013, the Court ruled that Planas was available for trial and denied defendant's request to depose her in the Philippines.  (Dkt. 583).

- <u>Letters Rogatory.</u>  On April 2, 2013, the Court directed defendant to file his proposed letters rogatory regarding the five defense depositions granted by the Court. (Dkt. 552).  On April 24, 2013, defendant asked for additional time to file his letters rogatory, seeking Philippine government permission to take his depositions.  (Dkt. 559).  This was granted by the Court on April 30, 2013. (Dkt. 560).  On May 8, 2013, defendant again sought additional time to file his letters rogatory.  (Dkt. 563). This was granted by the Court on May 14, 2013.  (Dkt. 564).  Defendant filed his application for issuance of letters rogatory on June 10, 2013.  (Dkt. 581).  However, this application did not meet the essential requirements of a letters rogatory identified by the State Department, and did not conform with the relevant procedural and formatting requirements.  On June 20, 2013, the Court directed defendant to file a corrected application for letters rogatory within 21 days.  (Dkt. 584).  Defendant made this filing on July 15, 2013.  (Dkt. 592).

Despite the extensive litigation – both before and after the court's March 2013 finding of excludable time – surrounding defendant's request to take foreign depositions, as soon as defendant's request to represent himself was granted, he withdrew his request to take the depositions.  At the September 9, 2013 hearing, defendant specifically stated that the depositions were his former counsel's litigation strategy, not his own, and that he believed the depositions would be cumulative of the testimony of witnesses who were expected to testify in person at the evidentiary hearing and trial.  (Dkt. 626).  The government was specifically granted

1  permission to inform the PDOJ that it no longer required the legal

2  opinion it had requested, regarding issues surrounding the taking of

3  the defendant's depositions.

4       On September 24, 2013 – after the government had already

5  informed the PDOJ that the requested opinion was no longer required

6  – defendant changed his mind, and filed a motion to reinstate the

7  taking of pretrial depositions.  (Dkt. 635).  The government

8  objected to defendant's request on October 21, 2013.  (Dkt. 656).

9  Defendant replied on November 12, 2013.  (Dkt. 676).  The Court

10 denied defendant's request to reinstate the depositions on February

11 21, 2014.  (Dkt. 720).

12      Defendant filed a request to reinstate the depositions on March

13 17, 2014.  (Dkt 735).  The government filed an opposition on March

14 25, 2014.  (Dkt. 748).  Defendant replied on April 7, 2014.  (Dkt.

15 757).  On May 22, 2014, the Court denied defendant's request for

16 reconsideration.  (Dkt 795).

17           5.   Additional pretrial litigation and outstanding
                 motions

18

19      Since defendant began representing himself on September 9,

20 2013, he has engaged in extensive pretrial litigation.  At the

21 September 9, 2013 hearing, the Court ordered defendant to file any

22 additional pretrial motions within ten days, and set a briefing

23 schedule.  (Dkt 626).  On September 19, 2013, defendant filed a

24 number of pretrial motions.  The government responded within the

25 time set by the Court, but on November 8, 2013, defendant requested

26 additional time to file his replies.  (Dkt. 674).  He has also filed

27 a number of other pretrial motions, applications, etc.  Motions that

28 are outstanding, or litigation that has been engaged in since the

23

1  Court's previous March 2013 finding of excludable time, not already
2  detailed above, includes the following:

3            a.   Motion to Suppress.  Defendant's motion to
4  suppress evidence was filed well before defendant began representing
5  himself.  The key issue in the motion, however, is whether the non-
6  governmental organization International Justice Mission ("IJM")
7  and/or the Philippine government were acting as an agent of the U.S.
8  government or in a joint operation with the U.S. government at the
9  time the evidence as seized.  In particular, defendant claims that
10  evidence collected by IJM at the time of his arrest by Philippine
11  Bureau of Immigration and the Dumaguete Police Department should be
12  suppressed, because they were acting as agents of the U.S.
13  government.  The government has already proffered the declarations
14  of the ICE agents investigating the case, as well as the IJM
15  employee present at the time the evidence was seized, each stating
16  that there was no joint investigation and that ICE had not directed
17  defendant's arrest or the seizure of evidence.  These witnesses can
18  be present on relatively short notice.  However, the testimony of
19  the PBI/Dumaguete Police Department officers who were present is
20  also required.  These constitute three of the five witnesses the
21  government has requested via MLAT:  Dionardo Carlos, Jose Ramon
22  Ugarte and Mabert Impas, Jr.  Defendant has repeatedly demanded that
23  these individuals be present at the evidentiary hearing.  Further,
24  as stated above, defendant waived pretrial depositions because the
25  deposition witnesses were "cumulative" of these witnesses.  Thus,
26  their presence is necessary to allow the Court to rule on
27  defendant's motion to suppress.

28

1          b.   Motion for Dismissal of Counts 1-5 with

2   Prejudice or Alternatively Order Production of Exculpatory Evidence

3   by Government Agents, Etc.   On September 19, 2013, defendant filed a

4   request that the Court dismiss the Indictment against him, or

5   alternatively order the government to produce unspecified

6   exculpatory evidence and unspecified proof of illegal alteration of

7   evidence.   (Dkt.   630).   That same day, defendant also filed a

8   Motion for Order for Findings of Fact and Conclusions of Law, which

9   appears to be a companion to his concurrently filed Motion for

10  Dismissal of the Indictment, based on his argument that the

11  government had withheld exculpatory evidence and/or falsified

12  evidence against him.   (Dkt. 629).   The government responded to

13  these motions on October 21, 2013.   (Dkt. 658).   Defendant sought

14  additional time to file his reply (see, e.g., Dkt. 707, 711), and

15  replied on March 17, 2014. (Dkt. 736).   This motion remains

16  outstanding.

17          c.   Motion for Additional Filings.   On September 25,

18  2013, defendant filed a motion requesting to be allowed to file

19  additional pretrial motions, after the September 19, 2013 motions

20  filing deadline.   (Dkt. 639).   The Court denied this motion on

21  September 27, 2013 (Dkt. 642).

22          d.   Second Superseding Indictment.   On October 17,

23  2013, the government filed a Second Superseding Indictment against

24  defendant.   This indictment simply corrected certain language from

25  the preceding indictment, and did not add additional charges.   (Dkt.

26  650).

27          e.   Request for Court Finding of Joint Venture

28  Between IJM and the US Government.   Although defendant insists that

                                    25

1  he is read for trial, in June 2014, he filed a motion, seeking a

2  court ruling that IJM and the US Government are engaged in a joint

3  venture.   (Dkt. 830; the document was signed June 6, 2014 but

4  appeared on the docket on June 16, 2014).   This filing reiterates

5  the same arguments made by defendant's motion to suppress - his

6  claim that IJM was a government actor, and therefore the government

7  is responsible for any fourth amendment violations by IJM in

8  obtaining evidence.   Defendant now adds, however, an argument that a

9  finding that IJM and the government were in a joint venture will

10  allow him to increase discovery demands.

11  **III. CONCLUSION**

12       Based on the outstanding pretrial motions - including the

13  motion to suppress that requires the testimony of foreign witnesses

14  whose travel must be authorized by the Philippine government - as

15  well as defendant's ongoing discovery requests, the availability of

16  defendant's stand-by counsel, and the necessity of allowing 5-6

17  months for the Philippine government to reauthorize witness travel

18  based on the setting of a new trial date, the government proposes a

19  trial date in early December 2014 or February, 2015.   Furthermore,

20  based on the extensive pretrial litigation in this case, including

21  outstanding motions, discovery requests, and defendant's ongoing

22  forensic examination of the digital devices in this case, the

23  government proposes that the Court make the excludable time filings

24  proposed in the attached Proposed Order Regarding Excludable Time

25  from March 8, 2013 through the new trial date.

26

27

28