# DECLARATION OF OLGA SAGALOVICH

I, OLGA SAGALOVICH, declare as follows:

1. I am a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement. I am the case agent assigned to <u>United States v. Stanley Dan Reczko, III</u>, CR 07-1221-GHK.

2. On May 29, 2014, I went with Assistant United States Attorney Joey L. Blanch to meet with Stanley Dan Reczko ("defendant") at Metropolitan Detention Center ("MDC"). Defendant's paralegal, Kathleen Caulfield, was also present.

3. At the beginning of the meeting, defendant asked if AUSA Blanch had any objection to asking the Court to wait until after his forensic exam was complete to set a trial date. AUSA Blanch had no objection but suggested that they still discuss possible trial dates so that the parties could check witness availability, begin arranging for travel, and comply with the Court's order.

4. Defendant and AUSA Blanch discussed a number of topics that defendant had emailed to AUSA Blanch, in addition to the trial date. Among other things, the following topics were discussed:

5. <u>Defense Witnesses.</u> Defendant wished to discuss how to get his witnesses here for the evidentiary hearing and trial. AUSA Blanch informed defendant that, other than assisting defendant with visas/special benefit paroles, the government was not responsible for arranging for defense witnesses' presence at trial. She informed him that she did not know how he arranged for defense witness travel, hotels, etcetera, but that perhaps he could consult with his stand-by counsel, David Kaloyanides.

1          a.   Going through defendant's emailed list of questions in order, AUSA Blanch noted that defendant's question regarding defense witness presence was repeated for specific defense witnesses, including Philippine Bureau of Immigration Agent "Diluson Montor," "Neda Alfeche," "Chrisopher Demerama," "Tindor and Magdalang," "the bell boy" and "maid" and Commissioner Libanon. AUSA Blanch reiterated that defendant was responsible for arranging for his witnesses to be present for trial, other than obtaining permission from the U.S. government for the witnesses to travel to the United States.

          b.   In addition, with respect to defendant's question regarding Commissioner Libanon, AUSA Blanch reminded defendant that prior to seeking the MLAT, the government had attempted to reconfirm his willingness to travel to the United States; after numerous attempts to reach him had been unsuccessful, the government concluded that he was deliberately attempting to avoid this communication and was no longer willing to travel to the United States.  Therefore, he was not part of the MLAT.

          c.   Defendant asked AUSA Blanch how his witnesses would be picked up, when they would arrive, and how he was supposed to interview them prior to trial.  AUSA Blanch said that she did not know.

     6.   <u>Special Benefit Parole/Visas for Defense Witnesses</u>:  AUSA Blanch informed defendant that the government would assist him in obtaining permission from the State Department for foreign defense witnesses to enter the United States.  This permission generally takes the form of a special benefit parole, if the defense witness does not have a visa.

2

a.  AUSA Blanch informed defendant that we could not begin the process of obtaining such permissions until defendant provided us with the witnesses' names, passport numbers, dates of birth, etc.  AUSA Blanch agreed to provide defendant and his paralegal a list of the information we needed from him in order to apply for the visa/special benefit parole.

b.  AUSA Blanch and I informed defendant that we would need that information at least 6-8 weeks in advance of travel in order to process and obtain the special benefit parole.  Based on my training and experience, I am aware that this is to allow the requesting agency -- in this case HSI -- time to determine if the witnesses have any criminal history that would prevent them being issued permission to enter the United States, prepare the applications and submit them for processing and approval.

c.  AUSA Blanch reminded defendant that this was the same process he and his former attorney, Larry Bakman, had engaged in when asking the government to obtain a special benefit parole for defense witness Lucy Planas.  I initiated the process for obtaining special benefit parole for Lucy Planas after Mr. Bakman provided the information required for that application.  Later, however, Ms Planas informed HSI in the Philippines that she did not need the special benefit parole as she would simply apply for a travel visa. If defendant still wants Ms Planas to travel to the U.S. to testify and she has not obtained a visa, I will reinitiate the special benefit parole process for Ms Planas.

7.  Defense Witness Passports:  AUSA Blanch cautioned defendant that defense witnesses would need to have passports before the government could assist defendant in applying for a visa/special

3

benefit parole, so the time for obtaining passports should be built into the trial date. She told defendant that the government was not responsible for obtaining passports for defense witnesses, but that it was possible that passport fees would be considered a defense witness travel expense for which CJA, or whoever was responsible for paying defense witness travel expenses, would pay.

8. <u>Philippine Government Permission for Defense Witness Testimony</u>: AUSA Blanch reminded defendant that for witnesses Jennifer Tadena, Anita Suico, Dionardo Carlos, Jose Ramon Ugarte and Mabert Impas, Jr., the government had been required to obtain permission from the Philippine government to allow them to travel and testify. This was because the subject of their testimony was their previous employment for the Philippine government - such as law enforcement officers or social workers. AUSA Blanch reminded defendant that this was the reason the government had had to send an MLAT request to the Philippine government regarding its witnesses. AUSA Blanch told defendant that she could not give him legal advice and did not know whether this rule would also apply to defense witnesses. However, she warned him that if such permission was needed, time for making that request should be built into the trial date. AUSA Blanch told him that if such permission was needed, she believed the process for obtaining such permission could be letters rogatory, which could be a time consuming process. However, she reiterated that she did not know if these rules applied to his witnesses and she could not give him legal advice.

9. <u>MLAT Approval</u>. AUSA Blanch told defendant that, for the previous trial date, the MLATs were approved for Jennifer Tadena, Anita Suico, Jose Ramon Ugarte and Mabert Impas, Jr.. The MLAT for

4

Dionardo Carlos had not yet been approved at the time the previous trial date was taken off calendar. AUSA Blanch told defendant that she had been informed by Don Ashley, Office of International Affairs, that permission for the witnesses to travel hinged on the trial date; when a new trial date is selected, the Philippine government will need to re-authorize travel for these witnesses.

10. <u>Pine villeramosa</u>. Defendant asked for the death certificate for Pine Villeramosa. AUSA Blanch confirmed that defendant was referring to Cipriana Villahermosa. She told defendant that the information regarding her death was related to us by defendant's former investigator, and the government did not have any death certificate.

11. <u>Chain of Custody Logs</u>. Defendant reiterated his request for the "Source and Chain" for the "Babywow" CD, the "Averie Fall Halloween" CD, and the "Sandisk 128 MB." I was present when AUSA Blanch previously provided defendant with the original chain of custody logs for these items for his inspection. I am not aware of any other "source and chain" logs for these items. AUSA Blanch again informed defendant that he had already been provided with all the chain of custody logs we have.

12. <u>OIA Discovery</u>. Defendant asked for all Department of Justice, Office of International Affairs ("OIA") reports and records regarding defendant in 2007. AUSA Blanch informed defendant that the Office of International Affairs was made up mostly of attorneys, and the government consulted them for legal advice regarding litigation relating for foreign countries. Therefore, many of their documents will be privileged. AUSA Blanch further informed defendant that OIA was often used to assist in obtaining provisional

arrest warrants and seeking extradition when charges have been brought in the United States against someone in a foreign country. She reminded him that he had been expelled from the Philippines in 2007 -- there had been no provisional arrest warrant or extradition proceedings against him -- so she did not know whether there would be any discoverable documents regarding him from OIA in 2007. She said she did not think so, but she would check.

    13. <u>Trial Date.</u> After discussing the items on defendant's emailed list, defendant indicated that he wished to go to trial as soon as possible after the forensic exam. AUSA Blanch asked him what that meant, as the forensic exam was scheduled for June. AUSA Blanch also reminded him that he would need time to arrange for his witness travel, special benefit parole, etc. He suggested September 22, 2014 for the evidentiary hearing and October 7, 2014 for the trial date. AUSA Blanch agreed to check with the witnesses to see if they could be available to travel then. AUSA Blanch and defendant then agreed on a number of factors regarding excludable time for the stipulation.

    14. <u>Defendant's Understanding Regarding Government Responsibility for the Presence of Defense Witnesses.</u>

        a. Defendant wished to know what the sanctions would be for "critical" witnesses that do not appear for the evidentiary hearing or trial. AUSA Blanch said that she did not know, other than that the government would lose the benefit of their testimony.

        b. While discussing defense witness travel, defendant made a statement to the effect that if the government was not responsible for ensuring defense witnesses were present, maybe the government was only responsible for making sure his witnesses were

6

present if the witnesses were in the United States. AUSA Blanch told him that the government was not responsible for defense witnesses, regardless of whether they were in the United States or were in a foreign country. AUSA Blanch clarified that by "government" she meant the U.S. Attorney's Office and the Department of Justice, not all parts of the federal government, and that of course he had the constitutional right to call witnesses in his own defense, request subpoenas, etcetera. But AUSA Blanch again clarified that she could not give him legal advice about how to get his witnesses there.

    c. When defendant indicated that he wished to go to trial as soon as possible, and did not appear to take into account the time necessary to arrange for his own witnesses to be there, AUSA Blanch suggested that perhaps we should step outside the room to allow defendant and Ms. Caulfield to confer in private. We did so. After they told us we could re-enter the room and we were taking our seats, defendant turned to Ms. Caulfield and stated firmly – with no attempt to communicate in a manner that we would not overhear -- that if his witnesses were not here at the trial date it would be the government's problem. Defendant then informed us that he wished to go to trial as soon as possible and stuck with the October trial date.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California on June 12, 2014.

OLGA SAGALOVICH